IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

NANCY A. LILLY,

        Plaintiff,

        v.                         Civil Action No. 5:07-CV-77

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

      Plaintiff, Nancy Lilly, (Claimant), filed her Complaint on June 12, 2007, seeking Judicial

review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of

Social Security, (Commissioner).[1]  Commissioner filed his Answer on August 21, 2007.[2]

Claimant filed her Motion for Summary Judgment on November 1, 2007.[3]  Commissioner filed

his Motion for Summary Judgment on December 3, 2007.[4]

B.    <u>The Pleadings</u>

      1.    <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

      2.    <u>Defendant's Brief in Support of His Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 14.

[4] Docket No. 17.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be DENIED.

2.    Commissioner's Motion for Summary Judgment be GRANTED.  The ALJ's
conclusion Claimant's mental impairments did not meet or equal Listing 12.04(C) is supported
by substantial evidence.  Additionally, the ALJ sufficiently considered Mr. Morrello's reports
and reasonably assigned limited weight to them.

## II.  Facts

A.    Procedural History

Claimant filed an application for Disability Insurance Benefits on March 17, 2004,
alleging disability since December 15, 2001 due to high blood pressure, thyroid disease,
depression, panic attacks, chronic headaches, endometriosis, adhesions, fear of leaving the home,
anxiety.  The application was initially denied on June 7, 2004 and upon reconsideration on
October 22, 2004.  Claimant requested a hearing before an ALJ and received a hearing on
September 22, 2005.  On April 3, 2006, the ALJ issued a decision adverse to Claimant.
Claimant requested review by the Appeals Council but was denied.  Claimant filed this action,
which proceeded as set forth above.

B.    Personal History

Claimant was 37 years old on the date of the September 22, 2005 hearing before the ALJ.
Claimant completed high school.  Claimant has prior work experience as a bank teller and loan
secretary.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: December 15, 2001 through April 3, 2006.

**Charleston Area Medical Center, 3/15/02, (Tr. 344)**
Review of systems (Psychiatric): No confusion or disorientation.  No depression or anxiety.  No
sleep disturbances.

**Charleston Area Medical Center, 3/15/02, (Tr. 368)**
Physical Examination (Neurologic): The patient is alert and oriented times three and appropriate
in affect.

**Ronald D. Pearse, ED.D., West Virginia Disability Determination Service, 5/10/04 (Tr. 557)**
Mental Status Examination: She arrived for her appointment casually attired.  Her hygiene was
good, although her grooming was quite disheveled.  She is reported to be 5 feet 3 ½ inches tall
and weighs 150 pounds.  The claimant was generally cooperative, although rather tense and
hesitant.  This hesitancy did diminish somewhat as rapport was established.  She made good eye
contact.  The client's spontaneity was rather limited and she would typically speak only when
queried.  The length and depth of her verbal responses were within normal limits and appropriate
to her level of intellect.  Her intellect is estimated to be within the Average range, based upon her
academic history, work history, and adaptive functioning.  The client was generally extroverted,
although somewhat tense and socially withdrawn at the beginning of today's evaluation.  Her
speech was both relevant and coherent, but at a moderately slow pace.  She was oriented to time,
name, place, and date.  Her mood was depressed and she displayed anxiety.  Her affect was
restricted.  She did not display signs and symptoms of psychosis.  Her thoughts were generally
organized, although her cognitions were somewhat slow.  This slowness in cognitive functioning
is mainly attributable to her current mood symptoms.  Her insights were deemed mildly
deficient.  Her judgments were deemed average.  She did not display signs or symptoms of
suicidal or homicidal ideation.  Her immediate recall was deemed to be within normal limits, as
the client was capable of immediate recall of all four words.  Her recent recall was deemed to be
within normal limits, as the client was later able to recall all four words after a 30-minute delay.
Her remote recall was often sketchy and she frequently had difficulty relaying personal and
historic facts with accuracy.  Her concentration was deemed average, as measured by the Digit
Span subtest of the WAIS-III.  She produced a scaled score of 8.  The client's motor behavior
was retarded.  The client did display motor tension today, and would occasionally rock in her
seat.

Diagnostic Impression:
Axis I: 300.21 Panic Disorder, with agoraphobia.; 296.21 Major Depressive Disorder, single
         episode, mild.
Axis II: V71.09 No diagnosis
Axis III: Reported hypertensions, thyroid condition, migraines, endometriosis, and adhesions.

<u>Concentration</u>: within normal limits.
<u>Persistence</u>: mildly deficient.
<u>Pace</u>: moderately deficient.
<u>Immediate memory</u>: within normal limits.
<u>Recent memory</u>: within normal limits.

**Robert Marinelli, Ed.D., DDS Physician, 6/3/04, (Tr. 577)**
<u>Psychiatric Review Technique</u>
12.04 Affective Disorders: A medically determinable impairment is present that does not
    precisely satisfy the diagnostic criteria above: Major Depressive Disorder, single, mild.
12.06 Anxiety-Related Disorders: Anxiety as the predominant disturbance or anxiety
experienced    in the attempt to master symptoms, as evidenced by at least one of the following:
        Recurrent severe panic attacks manifested by a sudden unpredictable onset of
intense        apprehension, fear, terror, and sense of impending doom occurring on the average
of at    least once a week.
        -A medically determinable impairment is present that does not precisely satisfy the
        diagnostic criteria above: Panic disorder with agoraphobia.
"B" Criteria of the Listings (12.04, 12.06): Rating of Functional Limitations:
        Restriction of activities of daily living: moderate
        Difficulties in maintaining social functioning: moderate
        Difficulties in maintaining concentration, persistence, or pace: mild
        Episodes of decompensation, each of extended duration: none
"C" Criteria of the Listings (12.04, 12.06): Evidence does not establish the presence of the "C"
        criteria.

**Arturo Sabio, M.D., 5/20/04, (Tr. 563)**
<u>Diagnostic Impression</u>: Hypertension, controlled; depression; panic disorder; migraine
headaches and history of endometriosis.

**Robert Marinelli, Ed.D., DDS Physician, 6/3/04, (Tr. 591)**
<u>Mental RFC Assessment</u>
<u>Understanding and Memory</u>:
Ability to remember locations and work-like procedure: no evidence of limitation in this
category
Ability to understand and remember very short and simple instructions: not significantly limited
Ability to understand and remember detailed instructions: no evidence of limitation in this
        category
<u>Sustained concentration and persistence</u>
Ability to carry out very short and simple instructions: not significantly limited
Ability to carry out detailed instructions: not significantly limited.
Ability to maintain attention and concentration for extended periods: no evidence of limitation in
        this category
Ability to perform activities within a schedule, maintain regular attendance and be punctual
        within customary tolerances: moderately limited

Ability to sustain an ordinary routine without special supervision: not significantly limited

Ability to work in coordination with or proximity to others without being distracted by them: moderately limited

Ability to make simple work-related decisions: not significantly limited

Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

<u>Social Interaction</u>

Ability to interact appropriately with the general public: moderately limited

Ability to ask simple questions or request assistance: not significantly limited

Ability to accept instructions and respond appropriately to criticism from supervisors: not significantly limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: moderately limited

<u>Adaptation</u>

Ability to respond appropriately to changes in the work setting: moderately limited

Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited

Ability to travel in unfamiliar places or use public transportation: moderately limited

Ability to set realistic goals or make plans independently of others: no evidence of limitation in this category.

<u>Functional Capacity Assessment</u>: 36 year old female alleges panic attacks, depression, anxiety. Please see her PRTF. . . .Section II of this provides an overview of her mental functioning. Claimant's MRFC is consistent with routine competitive employment involving short and simple instruction with low interpersonal and pressure requirements.

**Braxton County Memorial Hospital, 6/28/04, (Tr. 596)**
<u>Secondary diagnosis</u>: Depression/Psychosis, Insomnia.

**Safwat Attia, M.D., 10/6/04, (Tr. 600)**
<u>Diagnosis</u>: 296.34, 300.02, 300.21
<u>Assessment</u>: The patient is showing partial response to her treatment.

**Safwat Attia, M.D., 9/7/04, (Tr. 601)**
<u>Diagnosis</u>: 296.34, 300.02, 300.21
<u>Assessment</u>: The patient is showing partial response to her treatment.

**Safwat Attia, M.D., 8/3/04, (Tr. 603)**
<u>Diagnosis</u>: 296.34, 300.02, 300.21
<u>Assessment</u>: The patient is showing partial response to her treatment.

**Safwat Attia, M.D., 7/21/04, (Tr. 604)**
Diagnosis: 296.34, 300.02, 300.21
Assessment: The patient is showing partial response to her treatment.

**Safwat Attia, M.D., 7/1/04, (Tr. 606)**
Mental Status Examination: Examination showed an adult, white female. She was fairly dressed and groomed. She had an anxious, sad affect. She appeared tired. She was cooperative and showed no involuntary movements.
The patient's speech was clear and showed no articulation problem. She denied suicide or homicide thoughts. Although she reported hallucinations, she did not show evidence of hallucinations during the interview.
The patient appeared to be of average intelligence. She had fair memory and was able to recall three words out of three after a few minutes. She had fair concentration. She was alert and oriented to time, place, person and situation. She had a fair fund of knowledge and awareness of events in the media. She had fair abstract thinking and was able to interpret proverbs. She had fair judgment to hypothetical situations, and fair insight into her condition.

Diagnosis:
Axis I: Major Depressive Disorder, single episode, severe with psychotic features.
      Panic Disorder with Agoraphobia
      Generalized Anxiety Disorder
      Nicotine Dependence
Axis II: No Diagnosis
Axis III: Hypertension
       Hypothyroidism
Axis IV: Severe Stressor related to recent loss of family members
Axis V: GAF is 50.

**Joseph Kuzniar, Ed.D., DDS Physician, 10/22/04 (Tr. 667)**
Mental RFC Assessment
Understanding and Memory:
Ability to remember locations and work-like procedure: no evidence of limitation in this category
Ability to understand and remember very short and simple instructions: no evidence of limitation in this category.
Ability to understand and remember detailed instructions: not significantly limited
Sustained concentration and persistence
Ability to carry out very short and simple instructions: no evidence of limitation in this category
Ability to carry out detailed instructions: not significantly limited.
Ability to maintain attention and concentration for extended periods: moderately limited
Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: moderately limited
Ability to sustain an ordinary routine without special supervision: no evidence of limitation in this category

Ability to work in coordination with or proximity to others without being distracted by them: moderately limited

Ability to make simple work-related decisions: no evidence of limitation in this category

Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

Social Interaction

Ability to interact appropriately with the general public: not significantly limited

Ability to ask simple questions or request assistance: no evidence of limitation in this category

Ability to accept instructions and respond appropriately to criticism from supervisors: not significantly limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

Adaptation

Ability to respond appropriately to changes in the work setting: not significantly limited

Ability to be aware of normal hazards and to take appropriate precautions: no evidence of limitation in this category

Ability to travel in unfamiliar places or use public transportation: moderately limited

Ability to set realistic goals or make plans independently of others: not significantly limited

Functional Capacity Assessment: The MER and RFC ratings show the capacity to understand and remember 1-4 step routine instruction. The capacity to carry out routine instruction is at the 1-3 step level within a low performance demand work setting with a very low to low social interaction demand, the capacity for adaptation is as rated in Section I-1.

**Joseph Kuzniar, Ed.D., DDS Physician, 10/6/04 (Tr. 671)**
Psychiatric Review Technique

12.04 Affective Disorders: Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following:

anhedonia or pervasive loss of interest in almost all activities, or
sleep disturbance, or
decreased energy, or
difficulty concentrating or thinking

12.06 Anxiety-Related Disorders: Anxiety as the predominant disturbance or anxiety experienced     in the attempt to master symptoms, as evidenced by at least one of the following:

Recurrent severe panic attacks manifested by a sudden unpredictable onset
of          intense apprehension, fear, terror, and sense of impending doom occurring
on the average of at least once a week.

"B" Criteria of the Listings (12.04, 12.06): Rating of Functional Limitations:

Restriction of activities of daily living: moderate
Difficulties in maintaining social functioning: moderate
Difficulties in maintaining concentration, persistence, or pace: moderate

Episodes of decompensation, each of extended duration: none
"C" Criteria of the Listings (12.04, 12.06): Evidence does not establish the presence of the "C"
    criteria.

**Braxton Community Health Center, 9/27/02 - 12/9/02 (Tr. 714-718)**
Diagnosis: Postpartum depression.

**Braxton Community Health Center, 9/13/02, (Tr. 719)**
Assessment and Plan:
1) Panic attacks, probably secondary to postpartum depression.  The patient is given Effexor XR
starter pack.  She is given explicit verbal instructions to take 37.5 mg q d x one week and 75 mg
q d x one week.  She is also given a prescription for Elavil 10 mg #30 with no refills.
2) Hypertension.  Toprol XL is increased to 200 mg q d #30 with two refills.
3) Migraine cephalgia.  In addition to the Toprol XL and Effexor and Elavil combination the
patient is given a prescription for Percocet 10/650 #120 with no refills.

**Safwat Attia, M.D., 7/12/05, (Tr. 753)**
Diagnosis: 296.34, 300.02, 300.21
Assessment: The patient is responding fairly to her treatment.

**Safwat Attia, M.D., 6/7/05, (Tr. 754)**
Diagnosis: 296.34, 300.02, 300.21
Assessment: The patient could not tolerate side effects of the Risperdal; The patient is
responding fairly to the other medications.

**Safwat Attia, M.D., 4/25/05, (Tr. 755)**
Diagnosis: 296.34, 300.02, 300.21
Assessment: The patient is showing partial response to her treatment.

**Safwat Attia, M.D., 3/25/05, (Tr. 756)**
Diagnosis: 296.34, 300.02, 300.21
Assessment: The patient is showing partial response to her treatment.

**Safwat Attia, M.D., 2/21/05, (Tr. 757)**
Diagnosis: 296.34, 300.02, 300.21
Assessment: The patient is responding fairly to her treatment.

**Safwat Attia, M.D., 1/17/05, (Tr. 758)**
Diagnosis: 296.34, 300.02, 300.21
Assessment: The patient is responding fairly to her treatment.

**Safwat Attia, M.D., 12/21/04, (Tr. 759)**
Diagnosis: 296.34, 300.02, 300.21

<u>Assessment</u>: The patient is showing partial response to her treatment.

**Braxton Community Health Center, 7/25/05, (Tr. 761)**
Diagnosis: Bipolar disorder.

**Braxton Community Health Center, 5/13/05, (Tr. 763)**
Diagnosis: Anxiety/depression.

**Braxton Community Health Center, 4/29/05, (Tr. 764)**
Diagnosis: Depression

**Braxton Community Health Center, 2/9/05, (Tr. 767)**
Diagnosis: Bipolar disorder, depression, anxiety disorder.

**Braxton Community Health Center, 1/6/05, (Tr. 768)**
Diagnosis: Depression/bipolar disorder.

**Braxton Community Health Center, 12/6/04, (Tr. 769)**
Diagnosis: Bipolar disorder.

**Braxton Community Health Center, 11/24/04, (Tr. 770)**
Diagnosis: Depression/anxiety.

**Braxton Community Health Center, 11/22/04, (Tr. 771)**
Diagnosis: Bipolar disorder, anxiety.

**Michael Morrello, M.S., 7/26/05, (Tr. 772)**
<u>Psychological Evaluation, Test Results</u>:
<u>Weschler Adult Intelligence Scale-Revision III</u>:
Verbal IQ: 74
Performance IQ: 69
Full Scale IQ: 69

<u>Verbal</u>
Information: 4
Similarities: 5
Arithmetic: 6
Vocabulary: 9
Comprehension: 3
Digit Span: 7
Picture completion: 5
Coding:5
Picture Arrangement: 5
Block Design: 4

Matrix Reasoning: 6

Wide Range Achievement Test-Revision Three
Reading: 48 (raw score); 98 (standard score); PHS (grade score)
Spelling: 45 (raw score); 103 (standard score); PHS (grade score)
Arithmetic: 30 (raw score); 69 (standard score); 4 (grade score)

Beck Depression Inventory-Revision Two: On the BDI-II, Mrs. Lilly reported depressive symptoms that were measured within the Severe range (43). The symptoms that bother her the most include: feeling like a failure, feeling as if she is being punished, self-dislike, self-criticalness, indecisiveness, low energy, irritability, fatigue, anhedonia, guilty feelings, crying spells, insomnia, difficulty concentrating, and low libido. Also, she reported being bothered by suicidal ideation without intentions of acting on these thoughts.

Beck Anxiety Inventory: On the BAI, Mrs. Lilly reported anxiety symptoms that were measured within the Severe range (31). The symptoms that bothered her the most include: unable to relax, fear of the worst happening, heard pounding or racing, nervous, difficulty breathing, feelings of chocking, scared, and sweating (not due to heat).

Diagnostic Impression:
Axis I: 311 Depressive Disorder NOS
        300.01 Panic Disorder without Agoraphobia
        300.00 Anxiety Disorder NOS
Axis II: V62.89 Borderline Intellectual Functioning
Axis III: Thyroid Disorder, Migraine Headaches, Fibromyalgia, Adhesions, Endometriosis,
        Chronic Pain, Vomiting spells (by client report)
Axis IV: Economic Problem: low income
        Vocational Problem: unemployed
Axis V: 50

Summary/Recommendations: Mrs. Lilly is a 37-year-old Caucasian female who was referred to assess her overall psychological functioning. She is also applying for disability benefits. Her cognitive functioning was measured within the Borderline range. Cognitive Disorder NOS should be considered because it appears that her cognitive ability has decreased significantly since high school. Her achievement scores were higher than her ability level. Her personality profile was considered invalid. She states that she experiences depressive symptoms that were measured within the Severe range. Her visual-motor functioning was comparable to her cognitive functioning, but her performance should not rule out the possibility that an organic condition may exist.

**Michael Morrello, M.D., 7/26/05, (Tr. 781)**
Mental Residual Functioning Capacity Assessment
Limitations in understanding, remembering, and carrying out instructions:
Understand and remember short, simple instructions: mild

Carry out short, simply instructions: mild
Understand and remember detailed instructions: moderate
Carry out detailed instructions: moderate
Exercise judgment or make simply work-related decisions: moderate

> It appears that her ability to concentrate (which may be sporadic due to depressive and anxious symptoms) may make it difficult for her to understand instructions consistently.

<u>Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines:</u>
Sustained attention and concentration for extended periods: moderate
Maintaining regular attendance and punctuality: marked
Completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: marked

> Her depressive and anxious symptoms may make it difficult for her to complete a normal workday and maintain regular attention.

<u>Limitations in social functioning in a normal competitive work environment:</u>
Interacting appropriately with the public: moderate
Responding appropriately to direction and criticism from supervisors: moderate
Working on co-ordination with others without being unduly distracted by them: moderate
Working in co-ordination with others without unduly distracting them: moderate
Maintaining acceptable standards of grooming and hygiene: moderate
Maintaining acceptable standards of courtesy and behavior: moderate
Relating predictably in social situations in the workplace without exhibiting behavioral extremes:        moderate
Demonstrating reliability: moderate
Ability to ask simple questions or request assistance from coworkers or supervisors: moderate

> Her anxiety symptoms would make it difficult for her to perform socially.

<u>Adaptation in a work-setting</u>
Ability to respond to changes in the work setting or work processes: marked
Ability to be aware of normal hazards and take appropriate precautions: mild

> Her depressive and anxious symptoms would make it difficult for her to respond adequately to changes in the work setting.

<u>Functioning independently in a competitive work-setting</u>
Carrying out an ordinary work routine without special supervision: moderate
Setting realistic goals and making plans independently of others: moderate
Traveling independently in unfamiliar places: mild

> Her depressive and anxious symptoms would make it difficult for her to carry out a ordinary work routine or set realistic goals.

<u>Limitations in work adjustment</u>
Ability to tolerate ordinary work stress: marked

> Stress would more than likely cause an increase in her symptoms which are already measured within the severe range.

Do you feel that the impairments and limitations which you have identified have probably

existed at their current level of severity since 12/01, the alleged onset date?: Yes.

**Michael Morrello, MS, 7/26/05, (Tr. 787)**
Psychiatric Review Technique
12.04 Affective Disorders: Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following:
> anhedonia or pervasive loss of interest in almost all activities, or
> sleep disturbance, or
> decreased energy, or
> feelings of guilty or worthlessness, or
> difficulty concentrating or thinking, or
> thoughts of suicide.

12.06 Anxiety-Related Disorders: Anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following:

> -Generalized persistent anxiety accompanied by three of the following: motor tension; autonomic hyperactivity; apprehensive expectation.
> -Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week.

"B" Criteria of the Listings (12.04, 12.06): Rating of Functional Limitations:
> Restriction of activities of daily living: moderate
> Difficulties in maintaining social functioning: moderate
> Difficulties in maintaining concentration, persistence, or pace: moderate
> Episodes of decompensation, each of extended duration: one or two

"C" Criteria of the Listings (12.04, 12.06):
> Medically documented history of a chronic affective disorder (12.04) of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

Addendum to Psychological Evaluation: In regards to Mrs. Lilly's IQ scores, this psychologist feels this is a valid representation of her current cognitive functioning. The significant decrease in her cognitive from her reported academic performance may be related to psychological symptoms, medical symptoms, or as a response to her medications. If this is true, her cognitive functioning may return to previous functioning with an improvement of psychological and medical symptoms or a reduction in her medication.

**Safwat Attia, M.D., 9/13/05, (Tr. 802)**
Diagnosis: 296.34, 300.02, 300.21
Assessment: The patient is responding fairly to her treatment.

**Safwat Attia, M.D., 8/10/05, (Tr. 803)**
Diagnosis: 296.34, 300.02, 300.21
Assessment: The patient is responding fairly to her treatment.

**Dr. Joe Boyce, D.O., 11/6/05 (Tr. 804)**
Letter from Dr. Boyce: This letter is in regards to Nancy Lilly, as above. Mrs. Lilly is a 37 year old white female who has been under my active care for nearly four years. She has multiple medical problems including hypothyroidism, high blood pressure, chronic daily headaches, periodic intractable vomiting, bipolar disorder primarily depressive with occasional psychotic features, and chronic daytimes hypersomnolence. She is currently on the following medications. . . . The patient is unable to work, due to the above conditions, for at least 1 year.

**Braxton Community Health Center, 8/17/05, (Tr. 814)**
Diagnosis: depression, anxiety.

**Braxton Community Health Center, 10/21/05, (Tr. 816)**
Diagnosis: bipolar disorder

**Braxton Community Health Center, 10/17/05, (Tr. 817)**
Diagnosis: bipolar disorder

**Braxton Community Health Center, 12/19/05, (Tr. 819)**
Diagnosis: bipolar

**Braxton Community Health Center, 1/19/06, (Tr. 820)**
Diagnosis: bipolar disorder

**Braxton Community Health Center, 2/17/06, (Tr. 821)**
Diagnosis: bipolar disorder

**Braxton Community Health Center, 3/17/06, (Tr. 822)**
Diagnosis: bipolar disorder, depression.

**Braxton Community Health Center, 5/23/06, (Tr. 825)**
Diagnosis: bipolar disorder.

**Braxton Community Health Center, 6/22/06, (Tr. 826)**
Diagnosis: bipolar disorder/OCD per history.

**Dr. Doug Given, M.D., Braxton Health Associates, 8/18/06, (Tr. 854)**
Diagnoses:
1) Bipolar affective disorder, depressed, in full remission.
2) Tobacco use, nondependent, use disorder.
3) Hypertension, essential, unspecified.

**Dr. Doug Given, M.D., Braxton Health Associates, 9/22/06, (Tr. 862)**
Diagnoses:
1) Bipolar affective disorder, depressed, in full remission.
2) Tobacco use, nondependent, use disorder.
3) Hypertension, essential, unspecified.

**Dr. Doug Given, M.D., Braxton Health Associates, 10/18/06, (Tr. 868)**
Diagnoses:
1) Bipolar affective disorder, depressed, in full remission.
2) Tobacco use, nondependent, use disorder.
3) Hypertension, essential, unspecified.

**Dr. Doug Given, M.D., Braxton Health Associates, 11/15/06, (Tr. 874)**
Diagnoses:
1) Bipolar affective disorder, depressed, in full remission.
2) Tobacco use, nondependent, use disorder.
3) Hypertension, essential, unspecified.
4) Unspecified whether generalized or localized, osteoarthritis, other specified sites.

**Dr. Doug Given, M.D., Braxton Health Associates, 11/29/06, (Tr. 880)**
Diagnoses:
1) Bipolar affective disorder, depressed, in full remission.
2) Tobacco use, nondependent, use disorder.
3) Hypertension, essential, unspecified.
4) Unspecified whether generalized or localized, osteoarthritis, other specified sites.

**Dr. Doug Given, M.D., 12/18/06, (Tr. 893)**
General Medical Examination and Assessment
Psychiatric: Bipolar disorder, OCD, schizophrenia
Medical Impressions/Diagnoses: HTN, PMS, migraines, bipolar, schizophrenia, OCD, panic attacks, osteoarthritis, psychogenic vomiting.

**Dr. Doug Given, M.D., Braxton Health Associates, 12/29/06, (Tr. 880)**
Diagnoses:
1) Bipolar affective disorder, depressed, in full remission.
2) Tobacco use, nondependent, use disorder.
3) Hypertension, essential, unspecified.
4) Unspecified whether generalized or localized, osteoarthritis, other specified sites.

D.    Testimonial Evidence

Testimony was taken at the September 22, 2005 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 911)

Q        Approximately how many miles per week do you think you drive?  Just estimate.

A        Probably 10.

*                    *                    *

Q        Let's start with the earliest health problems that you had when you first stopped

working.

A        Well, when I first stopped working it was due to my pregnancy.  I had a lot of

urinary tract infections, a lot of swelling, and my doctor, OB doctor advised me to stay off work

because I couldn't stay on my feet the eight hours that I did before.

Q        Right.

A        So he took me off work and then after my son was born I started having problems

with postpartum depression that led into full blown depression and I started developing all these

other problems during the course of that time.

*                    *                    *

Q        Now you were telling us that after the childbirth and after you had recovered from

the thyroid that you developed some postpartum depression and then you said a lot of other

problems.  What happened to you?  What problems did you develop?

A        I developed bipolar, schizophrenia, obsessive-compulsive disorder.

Q        Let me ask you, who were your physicians who were treating you at that time?

A        Dr. Boyce [phonetic], and then he referred to me to a psychiatrist, Dr. Atia

[phonetic].

15

Q      And so are you still seeing both Dr. Boyce and Dr. Atia now?

A      Once a month.

Q      Once a month.

A      I see both of them once a month unless there's a problem that I need to go in sooner.  A vomiting problem or something of that nature.

Q      All right.  Let me ask you about the vomiting.  Do you have significant difficulty with that?

A      Yes, I do.

Q      Is there any pattern to the vomiting?

A      Mainly when I get upset or get nervous it usually brings on a spell.  They have eliminated any physical reason as far as gallbladder or upper GI and they feel that it all revolves around my nervous condition.

*          *          *

Q      You mentioned schizophrenia.  What do you mean by that?  What does that mean to you?

A      Well, my mind just doesn't work right.  I get real confused and see things that aren't there, hear things that aren't there.

Q      Do you recall when that began to be a problem for you, approximately?

A      I really can't remember.

Q      Well, let's think a minute.  Would it have been before or after you were pregnant with your second child, if you remember?

A      It was after I was pregnant with my second child. It was after I'd had the third

child.

Q      So this was something similar to the vomiting in the sense that they both more or less began some time after you had been off work?

A      Right.

Q      And in connection or after that third pregnancy?

A      Right.

Q      Okay.  Had there been any sign in your earlier life?  Had you had any problem, even briefly, with that, I'm going to call them hallucinations because that's what the doctors call them?  Had you had any of those episodes at all before then?

A      Never.

Q      Never?  Not even as a child or a teenager?

A      No, ma'am.

Q      Just everything.  Was there any particular stressful thing going on in your life at that time other than the childbirth?

A      Well, I lost my grandmother and my brother during a very short time span, like a month apart, that I lost them.

Q      Was this before or after the baby was born?

A      After.

Q      Now, once you were referred to Dr. Atia, has he tried you on various medications?

A      He has pretty much keep me on the same thing that Dr. Boyce started me on, the Geodon and the Lexapro.  We have pretty much stayed with that.

Q       He he adjusted your dosages from time to time?

A       I believe he has from time to time.

Q       Do you know what your current dosage is of the Geodon?

A       Yes, it's 80 mg, twice a day.

Q       This is to help you with the symptoms?

A       Psychotic - -

Q       Right.

A       Symptoms.  Anti-psychotic.

Q       Right. Has it worked?

A       Yes.

Q       Have you had any breakthrough episodes of - -

A       Yes, I have had a couple breakthroughs.

Q       Have they been at times of stress or just for no particular reason?

A       For no particular reason.

Q       When that happens are you aware that it is happening?

A       Yes.

Q       In other words, you know what is going on.

A       Yes, I know.

Q       I would imagine that might make it easier to deal with if you know what's

happening.

A       Yes, I do.

Q       Well, what about the other, you said the Lexapro?

A    Uh-huh.

Q    Is that for depression?

A    Uh-huh.

Q    Have you gotten along better with that?

A    Yes.

*          *          *

Q    Other than the spells that you told us about the vomiting, is there any other episodic thing that's happening to you in the course of a normal month?

A    The obsessive-compulsive disorder.

Q    Tell me about that.  What impact does that have on you?

A    Well, I have to do several things over repetitively or my mind won't rest.  A typical situation is the sink.  It has to be wiped out at least four times or I can't consider it clean.  The pillows have to be arranged in a certain order or that upsets me.  Just small things like that.

Q    Did I see something or did you tell me something about the children's straws?

A    Yes, I have a problem with red straws.  I don't use those in their drinks.  I don't know why.  I just can't put a red straw in their drinks.  It has to be a different color.

Q    Now, when you say you don't or you can't rest, how much distress do these things cause you if you can't get them the way you want them?

A    Great distress.

Q    What would that cause you to feel?  I mean, how would you feel?

A    I would be upset.

*          *          *

Q    And take me through the rest of your day, a normal day.  What happens then?

A    Well, probably around 10:00 or so, I fee[d] them breakfast, which would be mainly just cold cereal.  The oldest one can feed himself.  I have to feed the baby.  And we get finished with that, I change their diapers and pull-ups, whatever the case may be, and put their clothes on them.  And they pretty much watch t.v., play with their toys, entertain themselves mostly.

Q    What are you doing?

A    Well, on a good day I might load the dishwasher or unload it on a good day.  I might throw in a load of laundry if I'm having a good day.  I like to wash my own kids' clothes because I have a certain fabric softener I like to use.  So I like to at least, I don't care about the other clothes but their clothes I try to do.

Q    Does anyone else help you with household chores or the children?

A    Yes, my husband helps me greatly.

Q    What time does he, well, now, he is employed, right?

A    He is employed.

Q    What time does he leave and when does he come home?

A    He leaves about 8:00 in the morning and he tries to get home between 2:30 and 3:00, and at that time if I need a nap he takes, or I need to lay down, he takes over and I go to bed.

Q    You mean not just on the couch, you go - -

A    No, I go to bed.

Q    How often in the course of a week does that happen?

A     Probably two times a week.

Q     Has your illness, either physical or mental, caused any stress in your marriage?

A     Yes.

Q     How much?

A     A great deal.  When we got married, you know, I had an income.  We were living on two incomes.  Now, you know, there's just the one income and it's been very stressful.

Q     Now, your husband has grown children?

A     Yes, he does.

Q     In college?

A     One's in college and one's a teacher.

Q     Tell me about things like taking care of yourself.  You've talked about your children.  Are you able to take care of yourself such as dressing yourself, fixing your hair?

A     I'm able.  I just don't want to.

                    *              *              *

Q     You said you're able to care for yourself but you don't want to.  Tell me what you mean by that.

A     I don't want to put on makeup and fix my hair and stuff like I used to because I'm just too depressed.

Q     Do you always get dressed in the daytime?

A     No. No, many days I keep my nightclothes on.

Q     All day?

A     All day.

Q       Has your husband said anything to you about this?

A       Well, he does try to encourage me to take a shower and get dressed, but sometimes I just can't.

Q       Now, when you say you just can't, what is it that makes you feel that you just can't?

A       I'm either just too tired or in too much pain or I'm just too depressed. I just don't want to do anything.

Q       What about social things like getting out and being with other people or - -

A       No.

Q       When you say no, you mean not at all or you mean rarely or what do you - -

A       Very rarely. I don't like public situations. It makes me very nervous and makes me have panic attacks.

Q       How often do you have panic attacks?

A       I usually have one about 3:00 or 4:00 in the morning, every morning.

Q       Anything in the daytime?

A       Sometimes.

Q       Is there anything in particular that triggers the panic attacks?

A       If I'm out in public and there's a lot of people, that triggers it.

Q       Are you able to do shopping?

A       Very little.

Q       Do you have to make any special arrangements in order to do that or you just - - -

A       I usually try to pick a time where they won't be very busy and I make a list and

know exactly what aisle I can go down and my goal is to get in there and out of there as soon as possible.

*        *        *

E.      Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Lives in house with husband and children.  (Tr. 92)

- Difficulty sleeping at night due to panic attacks, pain, and worrying.  (Tr. 92)

- Able to care for her personal hygiene.  (Tr. 93)

- Prepares food for herself, mostly sandwiches.  (Tr. 111)

- Prepares food for family, including cereal, sandwiches, and bottles for the baby.  (Tr. 93)

- Does housework when able, including laundry, loading dishwasher, and child care.  (Tr. 93, 111, 928)

- Shops for food and medication (if husband is unable) for limited duration of time due to panic attacks around public situations.  (Tr. 94)

- Reads magazines for 1 hour per day; watches TV for 4-6 hours per day.  (Tr. 94)

- Does not engage in any hobbies.  (Tr. 95)

- Visits with family and friends at her house when able (if not too nervous to have visitors).  (Tr. 95)

- Leaves the house as able for doctors appointments and grocery store.  (Tr. 95)

- Has no difficulty getting along with others.  (Tr. 96)

- Experiences difficulty concentrating. (Tr. 96)

- Loses concentration if a task is too overwhelming. (Tr. 96)

- Must read instructions several times because cannot concentrate or stay focused. (Tr. 96)

- Sometimes wears her pajamas all day due to fatigue, pain, or depression. (Tr. 104, 930)

- Tries to do a load of laundry every day. (Tr. 111)

- Goes outside on porch daily, to deal with panic attacks. (Tr. 112)

- Talks to family and friends on the phone, 2-3 times per week. (Tr. 113)

- Can walk only 1/4 mile before needing to rest. (Tr. 114)

- Difficulty paying attention, following spoken instructions, handling stress and changes in routine. (Tr. 114, 115)

- Drives 10 miles per week. (Tr. 912)

- Takes care of her young children at home until her husband returns from work. (Tr. 924-28).

- Very rarely engages in social activities. (Tr. 930)

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's finding Claimant's impairments do not meet Listing 12.04(C) is not supported by substantial evidence. Claimant also alleges the ALJ failed to properly consider the opinion of Mr. Michael Morello, M.S., a DDS evaluator, when analyzing Listing 12.04(C). Commissioner contends the ALJ's finding as to Listing 12.04(C) is supported by substantial evidence.

B.    The Standards.

1.     <u>Summary Judgment</u>.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.     <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.     <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.     <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

404.1508, 416.908.

5.  <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.  <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to

make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to

determining whether the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied, not to substitute the Court's judgment for that of the

Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.  <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The

Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently

explained his rationale in crediting certain evidence in conducting the "substantial evidence

inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot

determine if findings are unsupported by substantial evidence unless the Secretary explicitly

indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231,

235-36 (4th Cir. 1984).

8.  <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat

less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.  <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is

disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C.    <u>Discussion</u>

     1.    <u>Whether Substantial Evidence Supports the ALJ's Determination Claimant's Impairments Did Not Meet Listing 12.04(C).</u>

Claimant contends substantial evidence does not support the ALJ's finding Claimant's impairments do not meet or equal the requirements of Listing 12.04(C). Claimant also alleges the ALJ failed to consider the opinion of Mr. Morrello, M.S., a DDS evaluator, when analyzing Listing 12.04(C). The Commissioner contends the ALJ properly concluded Claimant's mental impairments do not meet or equal the requirements of Listing 12.04(C).

At step three of the sequential analysis, an ALJ must determine whether any of a claimant's impairments meet or equal the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1. SSR 86-6. A finding that a claimant's impairment meets or equals a Listing in Appendix 1 results in a determination of disability without the need for further review, because the impairments listed in Appendix 1 "would ordinarily prevent an individual from engaging in any gainful activity." <u>Id.</u> The claimant bears the burden of proving that their impairment meets all -

27

not merely some - of the requirements of a listed impairment. <u>Fleming v. Barnhart</u>, 284 F. Supp. 2d 256, 269 (D.Md. 2003); <u>see</u>, <u>also</u>, <u>Pass v. Chater</u>, 65 F.3d 1200, 1203 (4th Cir. 1995). In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the ALJ's decision must include the reasons for the determination that an impairment does not meet a listed impairment. <u>Cooks v. Heckler</u>, 783 F.2d 1168, 1172 (4th Cir. 1986).

Listing 12.04, Affective Disorders, is met when the requirements in both "A" and "B" are met, or when the requirements in "C" are satisfied. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. The "C" criteria of Listing 12.04 "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity," <u>id.</u> at §12.00, and are met by evidence of:

> a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

<u>Id.</u> at §§ 12.04(C).

The ALJ in the present case found Claimant suffered from depressive disorder, not otherwise specified, borderline intellectual functioning, anxiety disorder, not otherwise specified, and panic disorder with agoraphobia. At step three of his analysis, the ALJ found the functional limitations arising from Claimant's mental impairments did <u>not</u> meet the "C" criteria of Listing

12.04, including 12.04(C). (Tr. 19-20). Claimant alleges the ALJ's findings are not supported by substantial evidence and the ALJ failed to consider all the relevant evidence, particularly Mr. Morrello's psychological evaluation dated July 26, 2005. For the following reasons, the Court finds the ALJ's findings regarding Listing 12.04(C)(1), (2), and (3) are supported by substantial evidence and reflect consideration of all relevant evidence, including Dr. Morrello's opinion.

      i.      <u>Listing 12.04(C)(1) - Repeated episodes of decompensation, each of extended duration</u>.

The ALJ found Claimant's affective disorder "has not resulted in repeated episodes of decompensation." (Tr. 22). In so finding, the ALJ relied on the absence of documented episodes of decompensation and absence of evidence Claimant required inpatient treatment for her mental impairments. (Tr. 22). The ALJ's findings are supported by substantial evidence because although Claimant experienced episodes of extreme depression, fatigue, depression, and panic, there is no evidence Claimant experienced "repeated episodes of decompensation" requiring a "significant alteration in medication, or documentation of the need for a more structured psychological support system (e.g. hospitalizations, placement in a halfway house, or a highly structured and directing household)," as defined in Listing 12.00(C)(4). Additionally, two of the three DDS evaluators who evaluated Claimant and completed a Psychiatric Review Technique Form determined Claimant's episodes of decompensation were "none." (Tr. 577, 671). While Dr. Morello, the third DDS evaluator, concluded Claimant experienced "one or two" episodes of decompensation, his conclusion, as explained below, was inconsistent with the record and therefore deserving of less weight. (Tr. 787).

      ii.     <u>Listing 12.04(C)(2) - A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate</u>.

The ALJ concluded "the evidence fails to establish a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate." (Tr. 22). The ALJ's conclusion is supported by substantial evidence. First, two of the three DDS Physicians who evaluated Claimant concluded Claimant's affective disorder did not meet the above criteria. (Tr. 577, 671). Second, while there is evidence Claimant's affective disorder impacts her home, personal, and social life, the evidence fails to establish Claimant is at risk for decompensating with "even a minimal increase in mental demand[] or change in the environment." Rather, the record shows Claimant is able to - on most days - care for her two young children while her husband is at work, perform household chores including loading the dishwasher and laundry, shop and visit friends. (Tr. 95, 111, 924-28). Third, DDS evaluators Robert Marinelli, Ed.D, and Joseph Kuzniar, Ed.D, concluded Claimant did not meet Listing 12.04(C) and retained the ability to work, albeit with restrictions. (Tr. 577, 591, 667, 671).

While DDS evaluator Mr. Morello, M.S., found Claimant did meet Listing 12.04(C)(2), (Tr. 787), the ALJ accurately concluded Michael Morello's reports were inconsistent with the record and therefore deserving of limited weight. As the ALJ explained, Mr. Morello's conclusions Claimant is "markedly" limited in some work-related areas is inconsistent with a) opinions from two other DDS evaluators that Claimant is only "moderately" limited in work-related abilities (Tr. 577, 591, 667, 671), b) reports from Dr. Attia that Claimant's condition was improving, (Tr. 753), 803), and c) Mr. Morello's own report of Claimant's performance on the mental status examination (Tr. 772). In light of these inconsistencies, the ALJ reasonably assigned limited weight to Mr. Morello's reports.

Contrary to Claimant's assertion, the fact the ALJ failed to explicitly reference the portion of Mr. Morello's opinion finding Claimant met Listing 12.04(C)(2) does not render the ALJ's opinion unsupported by substantial evidence. While the ALJ must "explore all relevant facts and inquire into the issues necessary for adequate development of the record," Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986), and "indicate explicitly that such evidence has been weighed and its weight," Arnold v. Secretary of H.E.W., 567 F.2d 258, 259 (4th Cir. 1977), the ALJ does not have a duty to document his consideration of every piece of evidence, see Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995). Rather, the ALJ merely must articulate at some minimum level his analysis of a particular line of evidence. Id. The ALJ sufficiently evidenced his consideration of Mr. Morello's reports and gave the Court no reason to believe he did not consider Mr. Morello's findings in the Psychiatric Review Technique Form dated July 26, 2005 wherein he concluded Claimant met Listing 12.04(C)(2).

iii.     Listing 12.04(C)(3): Current history of 1 or more year's inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The ALJ found Claimant "has no history of one or more years of inability to function outside a highly supportive living arrangement." The Court finds the ALJ's conclusion is supported by substantial evidence, namely evidence Claimant lives at home with her husband and children, is able to perform housework, take care of her children while her husband is at work, and leave the house to shop. (Tr. 95, 111, 924-28). Additionally, two of the three DDS evaluators found Claimant to be only moderately limited in areas of mental functioning and retain the ability to work, evidencing she does not possess an "inability to function outside a highly supportive living arrangement." (Tr. 591, 667).

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED**.

2.     Commissioner's Motion for Summary Judgment be **GRANTED**.  The ALJ's conclusion Claimant's mental impairments did not meet or equal Listing 12.04(C) is supported by substantial evidence.  Additionally, the ALJ sufficiently considered Mr. Morrello's report and reasonably assigned limited weight to the reports.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: February 19, 2008

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE